STATE OF NEBRASKA v. GEORGE H. HASTINGS, ATTORNEY GENERAL, JOHN C. ALLEN, SECRETARY OF STATE, AND AUGUSTINE R. HUMPHREY, COMMISSIONER OF PUBLIC LANDS AND BUILDINGS.

FILED JUNE 5, 1893. NOS. 6090, 6091, 6092.

1. **Constitutional Law:** COURT OF IMPEACHMENT. By the provisions of section 14, article 3, of the constitution of 1875 the supreme court did not succeed to any of the political functions of the senate as a court of impeachment under the prior constitution. The provision for the trial of impeachments before this court was intended to insure a strictly judicial investigation in such cases according to judicial methods.

2. **Impeachment:** MISDEMEANOR IN OFFICE. Where in an impeachment proceeding the act of official delinquency consists in the violation of some positive provision of the constitution or statute which is denounced as a crime or misdemeanor, or

where it is a mere neglect of duty willfully done with a corrupt intention, or where the negligence is so gross and the disregard of duty so flagrant as to warrant the inference that it was willful and corrupt, it is a misdemeanor in office within the meaning of section 5, article 5, of the constitution.

3. ———: ———: NEGLIGENCE OF OFFICERS: ERROR OF JUDGMENT. But where such act results from a mere error of judgment or omission of duty without the element of fraud, or where the alleged negligence is attributable to a misconception of duty rather than a willful disregard thereof, it is not impeachable, although it may be highly prejudicial to the interests of the state. MAXWELL, CH. J., dissenting.

4. ———: DEGREE OF PROOF. Impeachment is, with respect to the production of evidence and *quantum* of proof required to warrant a conviction, essentially a criminal prosecution, hence the guilt of the accused must be established beyond a reasonable doubt.

5. **Board of Public Lands and Buildings**: NATURE OF FUNCTIONS: QUASI-JUDICIAL ACTS. The functions of the board of public lands and buildings, in passing upon claims against the state, and in the selection of subordinate officers and agents authorized by law, are in their nature *quasi*-judicial. (*Brown v. Otoe County*, 6 Neb., 115.) MAXWELL, CH. J., dissenting.

6. **Officers**: LIABILITY FOR JUDICIAL ACTS. An officer is not liable for a judicial act, except where he acts willfully, maliciously, or corruptly. This is a rule of great antiquity, and rests upon the soundest public policy, and in its application is not limited to judges, but extends to all officers and boards charged with the decision of questions *quasi*-judicial in character.

7. **State Officers**: BOARD OF PUBLIC LANDS AND BUILDINGS: ERECTION OF CELL HOUSE: SELECTION OF SUPERINTENDENT OF CONSTRUCTION: ERROR OF JUDGMENT: MISDEMEANOR IN OFFICE. The legislature of 1891 appropriated $40,000 for the building of a cell house at the penitentiary by days' work. The board of public lands and buildings having said building in charge selected for superintendent of construction one D., known to be the agent and manager of M., the lessee of the prison labor, with the understanding that he would have to contract with M., his principal, in behalf of the state for the necessary labor and fix the price to be paid therefor. It does not appear that the labor could have been procured for less than the rate allowed by D., to-wit, $1 per day, and is admitted to have been worth more than that amount. *Held*, That the action of the board in select-

10

ing D. as the representative of the state, while highly censurable
as unbusiness-like and wanting in that intelligent regard for the
interest of the public which the state exacts from its officers,
was, at most, an error of judgment not amounting to a misde-
meanor in office.   MAXWELL, CH. J., dissenting.

8. **Legislative Appropriation for Erection of State Build-
ing**: STATE OFFICERS: ADVANCES OF MONEY TO DISBURS-
ING AGENT: IMPEACHMENT.   It is not a misdemeanor in office
to advance money appropriated by the legislature to a disburs-
ing agent to enable him to procure material and labor for the
erection of a public building of the state where such advance-
ment is not prohibited by law, especially where the state is
protected by a sufficient bond.   MAXWELL, CH. J., dissenting.

9. **State Officers**: BOARD OF PUBLIC LANDS AND BUILDINGS:
ERECTION OF CELL HOUSE: NEGLIGENCE OF SUPERINTENDENT
OF CONSTRUCTION: ALLOWANCE OF FRAUDULENT BILLS: MIS-
DEMEANOR IN OFFICE.   Through the negligence, incompetency,
or fraud of a superintendent of construction, the state was charged
for building material greatly in excess of the reasonable or mar-
ket value thereof, and for labor which had not been performed.
The bills rendered therefor were presented in the usual course
of business and allowed by the board of public lands and build-
ings, acting in good faith and in the belief that such claims were
legitimate charges against the state.   *Held*, That the allowance of
such claims is not a misdemeanor in office for which the mem-
bers of the board are impeachable.   MAXWELL, CH. J., dissent-
ing.

10.   ———: ———: IMPEACHMENT: MISUSE OF APPROPRIATION FOR
CELL HOUSE: ADVICE OF ATTORNEY GENERAL.   The board of
public lands and buildings used $500 of money appropriated for
the building of a cell house at the penitentiary to defray the cost
of visiting prisons in neighboring states, the alleged purpose of
such visit being to gain information with respect to the character
and quality of cells to be selected for said building, also improved
systems of ventilation and other methods of bettering the sani-
tary condition of the prison.   It appears that they were advised
by the attorney general that said money could be lawfully used
for the purpose named.   *Held*, That the test of their liability
in this proceeding is not whether such advice was technically
correct.   If they in good faith construed the law as authorizing
them to apply the money to the object named and actually used
it for such purpose they cannot be adjudged guilty of a misde-
meanor in office solely because this court may differently con-
strue the law.   MAXWELL, CH. J., dissenting.

11. ———: ———: ———: ———: EVIDENCE examined, and *held* not sufficient to warrant a finding that the respondents are guilty of converting any part of the sum last above named to their own use. MAXWELL, CH. J., dissenting.

12. ———: ———: ———: ———. The board of public lands and buildings, out of the cell house fund above named, paid the sum of $200 to defray the expenses of the warden and chaplain of the penitentiary as delegates to the National Prison Congress at Pittsburgh, Pennsylvania. While such expenditure was not within the scope of the authority of the board, and the respondents are liable to the state for the money so appropriated, they acted in good faith and from motives of humanity without the possibility of personal gain, and such facts are not sufficient in law to warrant their impeachment. MAXWELL, CH. J., dissenting.

13. ———: ———: ———: CONTRACTS: ALLOWANCE OF FRAUDULENT CLAIMS: FAILURE TO DETECT FRAUD: MISDEMEANOR IN OFFICE. During the year 1891 and the month of February, 1892, extensive frauds were practiced upon the state by contractors for coal at the asylum for the insane at Lincoln, although the amount of such frauds cannot be determined from the proofs. Following the practice which had prevailed for many years the board required all vouchers for supplies to be certified by the superintendent of the asylum as correct. When so certified they were compared with the contracts on file and if found to correspond and the extensions correct they were allowed. During the period mentioned, through the negligence or credulity of the superintendent, he was induced to certify to accounts largely in excess of the coal actually received and which were allowed by the board relying in good faith upon such certificates. The board at that time were required to disburse over $450,000 annually for current expenses and $225,000 for the erection of public buildings, which necessitated the examination of hundreds of vouchers monthly. *Held*, That the failure to detect and prevent the frauds in question is not *per se* a misdemeanor in office. MAXWELL, CH. J., dissenting.

14. ———: ———: ———: EXAMINATION OF CLAIMS AND APPROPRIATION BY LEGISLATURE: ALLOWANCE BY BOARD. Bills for coal amounting to $12,000 on account of the asylum for the last quarter of 1890 and the first quarter of 1891 remained unpaid, the appropriation for that biennial period having been exhausted. Said bills were submitted to the legislature of 1891 and referred to the proper committees for investigation and the sum of $12,000 appropriated with which to pay them. Subse-

quently they were certified to by the superintendent and allowed by the board in the belief that they were proper charges against the state. *Held*, That the action of the legislature is complete justification of the act of the board. MAXWELL, CH. J., dissenting.

IMPEACHMENT TRIAL before the supreme court under the provisions of section 14, article 3, of the constitution. *Judgment for defendants.*

*P. H. Barry*, *C. D. Casper*, and *George R. Colton*, managers.

*George W. Doane*, *S. B. Pound*, *W. L. Greene*, and *G. M. Lambertson*, for the state.

*George H. Hastings*, *J. R. Webster*, and *John L. Webster*, for defendant Hastings.

*C. A. Atkinson* and *John L. Webster*, for defendant Allen.

*M. L. Hayward*, *E. J. Murfin*, and *John L. Webster*, for defendant Humphrey.

POST, J.

This is an impeachment proceeding under the provisions of section 14, article 3, of the constitution. The articles of impeachment are three in number, containing in all twenty-one different specifications. However, before the final submission of the case, the first six and the twelfth specifications under article three were abandoned by the managers representing the legislature and do not call for notice in this opinion. The following is a summary of the several articles of impeachment and specifications thereunder :

Article 1. That respondents as members of the board of public lands and buildings did not "faithfully and prop-

erly disburse" the sum of $40,000 appropriated to build a cell house at the penitentiary by the legislature of 1891.

Specification 1. That respondents as members of said board carelessly, negligently, and willfully appointed William H. Dorgan superintendent and agent to buy material and superintend the construction of the cell house, knowing that he was the agent of Mosher, the prison contractor, whereby said Dorgan charged the state $1 per day for convict labor on the said cell house, which could have been procured for forty cents per day, whereby the state was defrauded.

Specification 2. The respondents as members of said board placed in the hands of Dorgan, as agent, large sums, of money in advance of payments made by him and without adequate security and without assurance that the same would be expended for the benefit of the state, whereby the state was defrauded.

Specification 3. That Dorgan purchased stone and other material at rates exorbitant and beyond what the same could have been purchased for in open market and that he returned false and fraudulent accounts charging these excessive prices and for excessive quantities and that the respondents as members of the board negligently, willfully, and corruptly accepted and audited said accounts, whereby the state was defrauded.

Specification 4. That Dorgan used about $232 of said money for labor and material, for the use of Mosher, and which did not go into the cell house, and the respondents as members of said board negligently, willfully, and corruptly accepted vouchers therefor, knowing the same had not been used in the cell house, whereby the state was defrauded.

Specification 5. That Dorgan charged for labor of convicts which had not been performed, and respondents as members of the board negligently, willfully, and corruptly audited and allowed his accounts, whereby the state was defrauded.

Specification 6. That in Dorgan's account were various items fraudulently charged and no vouchers therefor, and which respondents as members of said board negligently, willfully, and corruptly audited, and whereby the state was defrauded.

Specification 7. That Dorgan was entrusted with money to expend and disburse according to his own judgment, and that after Dorgan was superseded by Hopkins, his successor, the board and respondents, as members thereof, willfully, carelessly, and negligently failed to require a settlement and accounting with him, Dorgan.

Article 2. That respondents, as members of the board of public lands and buildings, unlawfully, willfully, and corruptly received and misappropriated to their own use moneys of the state which came to them as members of the board.

Specification 1. That respondents as members of said board did so receive and misappropriate $500.

Specification 2. That the respondents as members of said board did unlawfully, willfully, and corruptly misappropriate $200 of said money by paying same to Daniel Hopkins, who was not entitled to same.

Article 3. That respondents as members of said board had supervision and control over the state institutions and were responsible for the disbursements of the funds therefor, and negligently, willfully, and corruptly allowed accounts for coal furnished for the use of the insane asylum at Lincoln without proper examination thereof.

Specification 7. That the contractor the Whitebreast Coal & Lime Company, for the month of October, 1890, furnished 346,000 pounds of coal; for November, 1890, 642,000 pounds; for December, 1890, 662,000 pounds; for January, 1891, 378,700 pounds; for February, 1891, 497,300 pounds, and for March, 1891, 470,000 pounds, and rendered its account to the board for coal delivered for said months as follows: For October, 1890, 400,000 pounds;

November, 1890, 1,244,000 pounds; December, 1890, 1,480,000 pounds; January, 1891, 1,086,000 pounds; February, 1891, 1,240,000 pounds; March, 1891, 1,040,-000 pounds, and that on April 10, 1891, the board carelessly, negligently, and willfully approved the account after deducting 80,000 pounds.

Specification 8. That the board let a contract to Betts, Weaver & Co. to furnish supplies for the quarter commencing April 1, 1891, and that said contractors furnished for April, May, and June, 1891, 1,262,800 pounds of coal, but rendered an account for 2,870,700 pounds, and the board carelessly, willfully, and negligently approved said account without proper examination and verification.

Specification 9. That the board let the contract for coal to the Whitebreast Coal & Lime Company for the quarter commencing July 1, 1891, and that said company furnished coal to the asylum as follows: July, 1891, 365,000 pounds; August, 1891, 391,000 pounds; September, 1891, 308,000 pounds; but rendered accounts for July, 1891, 882,000 pounds; August, 1891, 983,000 pounds; September, 1891, 918,000 pounds, and the board carelessly, willfully, and negligently approved said accounts.

Specification 10. That the board let contracts for supplies to Betts, Weaver & Co. for the quarter commencing October 1, 1891, and that said contractors furnished coal as follows: For October, 1891, 501,500 pounds; November, 1891, 673,000 pounds; December, 1891, 761,000 pounds; but rendered account for October, 1,484,000 pounds; November, 1,480,000 pounds; December, 1,495,000 pounds, and the board, without examination and verification, carelessly, willfully, and negligently allowed the same.

Specification 11. That the board let the contract for coal to the Whitebreast Coal & Lime Company for the quarter commencing January 1, 1892, for the asylum. That the said company furnished coal as follows: For February, 1892, 674,000 pounds, but returned an account for 930,600

pounds, and that the board allowed said account, willfully, negligently, and carelessly, and without properly examining and verifying the same.

The answers of the respondents are substantially the same and may be summarized as follows: In addition to the duties of their respective departments, each is a member of numerous boards to which are attached varied and important duties. That the board of public lands and buildings during the years 1891 and 1892 were charged with the construction of ten public buildings, costing in the aggregate over $225,000, and the disbursement of appropriations for current expenses exceeding $800,000, so that it was impossible for said board to more than exercise a general supervision over the various public interests.

Specification 1. That in the construction of the cell house it was necessary to employ a superintendent; that Dorgan was considered a suitable person for that trust and deemed to be honest and capable, and his appointment was the result of their deliberate judgment, acting in good faith for the best interests of the state; that the employment of convict labor was by them deemed expedient; that the men employed were mostly skilled workmen and the rate allowed for their services, $1 per day, was not excessive.

Specification 2. It was necessary for the board to advance to the superintendent sums of money to defray current expenses as the only way to pay for the work without delay, and is the customary way of disbursing money for public work; and the same was advanced in good faith upon estimates made by the said Dorgan and upon the bond given by him in the sum of $10,000; and they deny that the state has been defrauded on account of said transactions in any sum whatever.

Specification 3. They have no knowledge that Dorgan presented any fraudulent or false vouchers, and deny that they willfully, negligently, or corruptly audited accounts without attempting to verify the correctness thereof; that

the settlement of Dorgan's account was postponed for the production of vouchers and awaiting the result of an investigation then in progress, by reason of which said accounts have not been audited and settled, and deny that the state has been defrauded thereby.

Specification 4. Allege that the $232 expended for fire brick and clay was for the setting of a boiler, the property of the state, to be used for heating the cell house in question, which was both lawful and expedient, and deny that the state has been defrauded.

Specification 5. Deny that they negligently, willfully, corruptly, or otherwise allowed any fraudulent or false charge for convict labor, and further say that in all cases they required a verification by the warden of the accounts for convict labor, and deny that the state has been defrauded as therein charged.

Specification 6. A denial of substantially all of the allegations thereof.

Specification 7. Allege that the board delayed final settlement with Dorgan for good and sufficient reasons, as more fully set forth in answer to specification 3.

Article 2.   Specification 1.   That during the construction of the cell house various questions arose with respect to the kind of cells to be selected therefor, the different systems of ventilation and other questions pertaining to the sanitary condition of the prison; that the lessee of the penitentiary was by law bound to furnish eighty cells at his own expense, and had notified the board of his readiness to construct or furnish them according to any plan adopted by the state; that being entirely without experience in the construction or management of prisons, and desiring to fully discharge their duty to the state they determined to visit and personally inspect certain recently constructed and well regulated institutions in other states; that they, in company with the warden, visited said prisons, some seven in number; also the Pauly Jail & Cell Works, of St. Louis, Missouri,

using the sum of $500 of the cell house fund for the purpose of defraying their expenses, in addition to considerable of their private funds which were required for that purpose; and that the action in question was prompted alone by a conviction of duty to thus obtain the information necessary for their guidance in the discharge of the duties of the state.

Specification 2. In the month of October, 1891, the board used the further sum of $200 out of the cell house fund to defray the expenses of the chaplain and warden of the penitentiary in attending a session of the National Prison Congress organized to encourage humanitarian methods of conducting prisons and the reformation of the criminal classes; that in so applying the money in question to the purpose named their motives were to protect the public interests alone.

Article 3. Specification 7. The items for coal for October, November, and December, 1890, were unpaid by the former administration for want of funds, and these items, with items for coal for January, February, and March, 1891, were by the officers of the asylum presented to the legislature of 1891 and the same allowed and ordered paid by the said legislature and an appropriation made therefor; the respondents are not guilty of misdemeanor relating thereto.

Specifications 8, 9, 10, and 11. When respondents were inducted into office, January 9, 1891, they had no especial knowledge of the amount of coal and other supplies required for the public institutions; that a superintendent, steward, and book-keeper had been appointed by the governor for the Lincoln asylum and who had long held said offices; that said officers had all given bond and taken an oath to faithfully discharge their duties and were by the respondents deemed honest and capable; that in allowing bills for coal, they relied, as they had a right to do, upon the certificate of the superintendent, that said bills were correct and that the coal therein called for had in fact been furnished.

The foregoing is believed to be a fair statement of the issues and which are presented more in detail than would have been deemed necessary or proper in an ordinary action or proceeding.   When we have cleared away the rubbish, to use a homely phrase, and stripped this case of the features which are wholly irrelevant, or at most but incidental to the real controversy, we find the questions involved to be few and by no means difficult of solution. In the first place it should be remembered that the purpose of this investigation is to determine whether the respondents have been guilty of misdemeanor in office, and not an action on their official bonds or to state an account between the state of Nebraska and Dorgan or parties furnishing coal for the use of the asylum at Lincoln.   It should also be borne in mind that the only charges with respect to the cost or value of the cell house are those contained in the 3d, 5th, and 6th specifications under article 1.   But as the proofs are confined to specifications 5 and 6, they alone will be examined.

Volumes might be written on the subject of the cost and value of the different walls as well as the roof and foundation of the cell house, also the amount of labor and material furnished therefor by Dorgan and Hopkins respectively, and in the vain attempt to reconcile the estimates of the many witnesses who have testified on that question. I am satisfied that it was a mistaken sense of duty which prompted us to permit first the state and, afterward, the respondents to introduce evidence of that character.   The result is that we have consumed days and even weeks in hearing proofs wholly irrelevant to the real issues of the case.   It may be further said that the evidence on that subject is of the most unsatisfactory character even for expert testimony.   For instance, according to my recollection, no two of the state's witnesses agree as to the length or height of the exterior walls of the structure, and differ more than $14,000 in their estimate of its present value.   With the

foregoing observation I will dismiss the subject of the present value of the cell house and proceed to consider the several charges in their order.

Preliminary to an examination of the charge contained in specification 1 of article 1, it should be observed that on the 22d day of October, 1877, the penitentiary grounds and convict labor were leased by the state to W. H. B. Stout for the period of ten years, and by an act approved March 2, 1887, said contract having been assigned to C. W. Mosher, was extended for ten years from October 1, 1889. It is further provided by said act that Mosher shall receive forty cents per day for each convict as full compensation under said contract. At the time of the appointment of Dorgan to superintend the construction of the cell house he was the agent and manager of Mosher, the lessee of the penitentiary, and charged with the duty of sub-leasing the prison labor. In view of that fact his selection by the board as the representative of the state, knowing, as will hereafter appear, that it would be obliged to depend upon Mosher for labor to carry on the work, is highly censurable and should, to say the least, be characterized as unbusiness-like and utterly wanting in that intelligent regard for the interests of the state which the law demands of public officers under like circumstances. It is true, according to the evidence, that Dorgan was recommended to the board by reputable parties, and previous to his resignation no charges had ever been made within the knowledge of respondents affecting his character or fitness for the position. That fact, while it may to some extent extenuate, will not excuse his selection for so important a trust. But has the state been defrauded thereby as charged? The answer to that question depends upon whether the labor could have been procured for less than the amount allowed. In this connection it is proper to examine the provision for the cell house, which is found in the general appropriation act of 1891, under the title "Peni-

tentiary," and is in the following language: "Building new cell house by days' work, forty thousand dollars." The motives of the legislature are not involved in this controversy, yet the appropriation in question might with equal propriety have been entitled "An act for the relief of C. W. Mosher," since it is a palpable fact that he was beyond the reach of competition. The rules of the prison forbid the employment of free laborers within its walls, hence the contractor was practically able to dictate the wages to be paid by the state. There is, however, no evidence tending to prove that the labor could have been procured on terms more advantageous to the state, or that the amount charged, $1 per day, is excessive. It is true convict labor has been let to some of the subcontractors at the prison as low as forty cents per day, but such employment has been for a term of years, and the employers have in every such case been subjected to the additional expense of costly machinery. It is also shown that the state had on two previous occasions employed convict labor, allowing therefor $1 per day. The state's witnesses who testify on the subject all agree in placing the value of the labor per day at figures largely in excess of the rate charged therefor. The wrong to the state in that regard consists in the charging for labor not rendered, which will be considered hereafter, rather than the rate per day. The charge in that specification is, therefore, not sustained by the proofs.

2. The charge in the second specification is the advancing to Dorgan of money out of the cell house fund before the labor therefor had been performed, or the material furnished, without adequate security. It is not charged that such advancements were made corruptly or even negligently. It should be mentioned in this connection that upon the appointment of Dorgan he was required to give a bond in the sum of $10,000, conditioned that he would faithfully discharge his duties and account for all moneys which might come into his hands. That bond is admitted

to be good and ample security for any amount now due to the state. Nor does it appear that he was at any time entrusted with money in excess of the amount of the bond aforesaid. On the 1st day of June, 1891, Dorgan presented to the board an estimate, of which the following is a copy:

"ESTIMATE No. 1.

"For work done and material furnished during the month of May, 1891, for cell house at penitentiary:

| | |
|---|---:|
| Cut stone | $1,000 |
| Concrete | 750 |
| Excavating | 350 |
| Material on hand not used | 4,000 |
| | |
| Balance due contractor | $6,100 |

"The above estimate was made by me this 1st day of June, 1891, and I hereby certify that the amount of work done and materials furnished by said contractor are true and correctly stated and set forth in the above estimate, and that the said estimate is made in the manner and according to the plans and specifications mentioned in the contract with the said state and said contractor.

"W. H. DORGAN,
"Superintendent."

Accompanying said estimate was a voucher for $6,100, as follows:

"THE STATE OF NEBRASKA,
"To W. H. DORGAN, Dr.
"For material used in building new cell house, per estimate No. 1 hereto attached.................... $6,100
"Examined and approved June 1, 1891, by the board of public lands and buildings, and account to be charged to appropriation for penitentiary, new cell house.

"JOHN C. ALLEN,          A. R. HUMPHREY,
"Secretary.                    President."

Upon the approval of the above voucher a warrant was issued in his favor for the amount named therein. In like manner he was allowed $8,000 August 3, 1891; $8,000 October 5, 1891; $5,000 December 7, 1891, and $5,000 March 7, 1892, making a total of $32,100, of which $6,300 was turned over by him to Hopkins on the appointment of the latter. It may be assumed that the sums above enumerated were all advanced by the board before the procuring of the labor or material therefor. But as the charge involves no issue of fraud or negligence the only question necessary to examine is whether the advancing of the money aforesaid is a violation of any positive law. The only provisions to which we have been referred as bearing upon the subject are section 22, article 3, and section 9, article 9, of the constitution which are copied in the order named.

"Sec. 22. No allowance shall be made for the incidental expenses of any state officer except the same be made by general appropriation, and upon an account specifying each item. No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law, and on the presentation of a warrant issued by the auditor thereon, and no money shall be diverted from any appropriation made, for any purpose, or taken from any fund whatever, either by joint or separate resolution. The auditor shall, within sixty days after the adjournment of each session of the legislature, prepare and publish a full statement of all moneys expended at such session, specifying the amount of each item, and to whom and for what paid."

"Sec. 9. The legislature shall provide by law that all claims upon the treasury shall be examined and adjusted by the auditor, and approved by the secretary of state before any warrant for the amount allowed shall be drawn; *Provided*, That a party aggrieved by the decision of the auditor and secretary of state may appeal to district court."

In my judgment neither of the above provisions are applicable. The provision for the cell house invested the

board with a discretion with respect to the money appropriated therefor, which, in the absence of fraud or mistake, is a sufficient justification of the act charged. The above constitutional restrictions were intended to limit the payment of claims to those for which specific appropriations have been made. But while the advancing of money appropriated, to a disbursing officer or board as in this case, is of doubtful wisdom because liable to abuse, it is not prohibited by any express provision of the constitution or necessary implication therefrom. There are also numerous legislative precedents for the action of the board, a few only of which need be noticed. For instance, by chapter 115, Laws 1885, $15,000 was appropriated for an exhibit at the New Orleans cotton exposition, to be drawn by the governor, who was made the sole disbursing officer, and to be spent at such times and for such purposes as in his own judgment was deemed expedient. By an act approved February 6, 1891, $100,000 was appropriated for the relief of "the people in the drouth-stricken districts" of the state, and a board, designated therein as a "Relief Commission," authorized to draw and disburse the money so appropriated. By an act approved March 27, 1891, $50,000 was appropriated for an exhibit at the Columbian exposition, to be drawn and expended by a commission created by said act upon estimates to be followed in a reasonable time by a detailed statement and vouchers. But a case in point is the *Impeachment of Melville*, in 1806, on the charge of drawing funds as treasurer of the navy before they were needed for public use. In that case the house of lords submitted to the judges of common pleas two questions, viz., 1st, whether it was unlawful to draw public money in advance of the time it was needed for public use but for the purpose of having it for that use; 2d, if such act was an offense. Both questions having been answered in the negative the accused was acquitted. (29 How. State Tr., 1469.)

There exists in my mind a grave doubt as to the consti-

tutional authority of a state board to audit claims against the state, but assuming, as do the managers, that such power exists, I do not doubt that they may lawfully place money in the hands of a superintendent to be used by him for the purpose designated in the appropriation, in the absence of a special provision to the contrary, after adopting proper precautions for the protection of the state.

3. With respect to specification 3, it may be said that the bills rendered for stone are grossly in excess of the reasonable or market value thereof through the negligence, incompetency, or fraud of the superintendent. The latter, it is disclosed, contracted with Atwood & Co. for the necessary stone to be delivered on the cars at Cedar Creek, Cass county, or other points not more remote from Lincoln, agreeing to pay eight cents per 100 pounds for common rubble, sixteen cents per cubic foot for dimension stone, and thirty-five cents per cubic foot for stone " plugged to size"—that is, drilled and blasted according to designated measurements. It also appears that Atwood & Co. purchased all of the dimension stone from J. W. Zook and E. D. Van Court, of Nemaha county, paying therefor ten cents per cubic foot, also a portion of the rubble at four cents per 100 pounds, and which was all billed to the state and paid for at the contract price. The price paid by Atwood & Co., it is shown, is a trifle below the market value of the stone, but the difference does not exceed two cents per cubic foot. Zook testifies also that he received a written inquiry from Dorgan previous to the contract of the latter with Atwood & Co. concerning the price of stone, and in reply quoted the prices above named, but which is denied by Dorgan. There is, however, no evidence that the board, or the respondents individually, or any of them, participated in or had any knowledge of such frauds or overcharges. Nor was such a contention made at any time by the managers during the trial, except perhaps with respect to specification 1 of article 2, which will be noticed here-

11

after.    On the other hand, their conduct is entirely con-
sistent with good faith and honesty of purpose, although,
it may be admitted, indicating a lack of judgment and a
proper degree of diligence under the circumstances.    There
was certainly nothing upon the face of the bills rendered
by Atwood & Co. calculated to excite suspicions in the
minds of persons not familiar with the price of stone, and
it is not difficult to conceive how they might easily have
borne the scrutiny of more exacting and cautious officers
than the state board.

4. By the proofs under this specification are presented
the vital question in the case, viz., whether the respondents
are impeachable for failing to detect and prevent the al-
leged frauds against the state, or, as a broader statement of
the same proposition, what under our constitution amounts
to an impeachable misdemeanor?    It is safe to say that no
question of greater importance has ever been submitted for
the consideration of this court.    And in its solution we
have endeavored to adopt the rule best sanctioned by au-
thority and which is just, alike to the state and its servants.
It is sufficient for our purpose at present to say that we
are constrained to reject the views of Professor Dwight,
Judge Curtis, and other advocates of the doctrine that an
impeachable misdemeanor is necessarily an indictable of-
fense, as too narrow and tending to defeat rather than pro-
mote the end for which impeachment as a remedy was de-
signed and not in harmony with the fundamental rules of
constitutional construction.    On the other hand, the con-
tention of counsel for the state, that the term misdemeanor
in office is not susceptible of a legal definition, but that
every such proceeding should be determined upon the facts
in the particular case, is, to say the least, strikingly illogical.
There is one fact which cannot fail to impress the judicial
mind from an examination of our constitution, viz., that
the provision for the trial of impeachments before the su-
preme court was to insure a strictly judicial investigation

according to judicial methods.   It cannot be successfully maintained that this court has succeeded to any of the political functions of the senate as a court of impeachment under the first constitution.   The former practice has been justly condemned on account of its political and, it must be confessed, too frequent partisan character, but the substitution of a judicial oligarchy for the form of democracy is not to be commended as a measure in the interest of reform.   As said by Judge Story, "It is so incompatible with the genius of our institutions that no lawyer or statesman would be inclined to countenance so absolute a despotism and practice, which would make that a crime at one time or in one person which would be deemed innocent at another time or in another person;" and Senator Davis, in *Johnson's Impeachment,* vol. 3, 157, said: "But the position that the senate when trying an impeachment is a law to itself, is bound by no law, may decide the case as it wills, is illimitable and absolute in the performance of special, restricted, judicial functions, in a limited government, is revoltingly absurd."   The sound rule and the one approved by the most eminent jurists and statesmen of this country lies midway between the two extremes.   Judge Lawrence, in his brief for the managers in *Johnson's Impeachment,* 6 Am. Law Reg., 680, states the rule thus: "The result is that an impeachable high crime or misdemeanor is one in its nature or consequences subversive of some fundamental or essential principle of government or highly prejudicial to the public interest, and this may consist of a violation of the constitution, of law, of an official oath, or of duty by an act committed or omitted, or, without violating a positive law, by the abuse of discretionary powers from improper motives or for an improper purpose."   Senator Doolittle, in the same case, p. 246, said: "But to say that a high public officer, with good motives and with an honest intent to obey, though he mistake the meaning of the stat-

S ate v. Hastings.

ute, can be found guilty of a high crime or misdemeanor which shall subject him to the heaviest punishment which can fall upon a public man in high office is to assert a doctrine never before heard in any court of justice." Senator Fessenden, in the same case, p. 29, referring to the argument that the term, misdemeanor in office, could not be accurately defined, said: "Granting, for the sake of argument, that this latter construction is the true one, it must be conceded that the power thus conferred might be liable to very great abuse, especially in times of high party excitement, when the passions of the people are inflamed against a perverse and obnoxious public officer. If so, it is a power to be exercised with extreme caution when you once get beyond the line of specific criminal offenses." And in Pomeroy's Const. Law, 602, it is said: "Wherever the president or vice president, or any civil officer, has knowingly and intentionally violated the express terms of the constitution or of a statute which charged him with an official duty to be performed without a discretion, and wherever a discretion being left, within the bounds of which he has an ample choice, he exercises that discretion in a willful and corrupt manner, or even in a rash and headstrong manner, unmindful of the ruinous consequences which his acts must produce, he is impeachable." It may be safely asserted that where the act of official delinquency consists in the violation of some provision of the constitution or statute which is denounced as a crime or misdemeanor, or where it is a mere neglect of duty willfully done, with a corrupt intention, or where the negligence is so gross and the disregard of duty so flagrant as to warrant the inference that it was willful and corrupt, it is within the definition of a misdemeanor in office. But where it consists of a mere error of judgment or omission of duty without the element of fraud, and where the negligence is attributable to a misconception of duty rather than a willful disregard thereof, it is not impeachable, al-

though it may be highly prejudicial to the interests of the state.

5. Another question closely allied to the one last discussed is the character of the duties imposed upon the board of public lands and buildings, such as the selection of a superintendent of construction for the cell house and in the auditing of accounts against the state. It has been suggested that such duties are analogous to those of ordinary trustees and that the respondents are therefore impeachable for a failure to exercise such a degree of diligence as is required of ordinarily prudent men under like circumstances. That proposition is certainly indefensible, either upon reason or authority. It has been repeatedly decided by this court, and may be regarded as the settled. law of the state, that duties of the character enumerated are *quasi*-judicial. For instance, in *Brown v. Otoe County,* 6 Neb., 115, a carefully considered case, LAKE, Ch. J., approves of the following language: "We have, after much reflection and upon due consideration, reached the conclusion that the board of commissioners in passing upon claims act in a judicial capacity." In Bishop on Non-Con. Law, 786, *quasi*-judicial functions are thus defined: "When the law in words or by implication commits to any officer the duty of looking into facts and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial, the function is termed *quasi*-judicial."

6. Another rule, so well settled as not to admit of controversy, is that public officers are not liable even in a civil action for judicial acts, however erroneous, unless they are. shown to have acted willfully or corruptly. The cases which recognize that rule are so numerous that it is impracticable to cite them at length in this opinion, but they. will be found in the notes under sec. 713, Throop, Public Officers, and Mechem, Public Officers, 639, 640. (See also Stephen's Digest Crim. Law, art. 119; Whart.,

Crim. Law [9th ed.], 1572; *Impeachment of Scroggs, Ch. J.*, 8 How. St. Tr., 163, 190; 1 Bishop, Crim. Law, 299, 460.) It follows from what has been said that the action of the board in selecting Dorgan to superintend the construction of the cell house, and in allowing the bills contracted by him, was in character essentially judicial. Their fault was a mere error of judgment not involving either moral turpitude or gross and willful neglect of duty, and does not therefore amount to a misdemeanor in office.

7. Another question which is suggested in this connec-. tion is the character of this proceeding, viz., whether it is to be regarded as a civil action or as a criminal prosecution for the purpose of the production and the *quantum* of proof to warrant a conviction. It may be safely asserted that the decided weight of authority in this country and England, if indeed there exists a diversity of opinion on the subject, is that impeachment in that respect must be classed as a criminal prosecution, in which the state is required to establish the essential elements of the charge beyond a reasonable doubt. Blackstone (vol. 2, book 4, p. 259) thus defines the proceeding: "But an impeachment before the lords by the commons of Great Britain in parliament is a prosecution of the already known and established law and has been frequently put in practice, being a presentment to the most high and supreme court of criminal jurisdiction by the most solemn grand inquest of the whole kingdom." In the *Impeachment of Belknap* Senator Wright used the following language: "Because it does not satisfy me upon this point beyond a reasonable doubt, and because it is quite wanting in everything like directness and force, * * * I feel bound to vote not guilty." Language of similar import was used by Senators Christiancy, Booth, Oglesby, and others. But we are fortunately not without judicial authority on the subject. In the *Impeachment of Barnard*, 1872, the judges of the court of appeals of New York sat with the senators and appear

to have been consulted upon all doubtful questions. Chief
Justice Church, p. 2070, speaking upon the subject under
consideration said: "If I felt warranted in balancing the
evidence and in determining that question in a civil action,
I might come to the conclusion that the evidence of pay-
ment was not reliable, but we are here in a criminal case
where the respondent is entitled to the benefit of every
reasonable doubt, both upon the facts and the law, and I
cannot say that the evidence which has been produced is
not sufficient to create some doubt." Judge Andrews, p.
2071, said: "I shall vote not guilty upon this article,
upon the principle that this defendant is entitled to
every reasonable doubt and that that doubt as to his
guilt according to the charge exists in my mind upon
the evidence in the case." Like views were expressed by
other judges, but there was no dissent from the opinions
above quoted. And in *State v. Buckley*, 54 Ala., 599, im-
peachment is defined as a criminal proceeding without the
right of trial by jury. It is not alone in form but also in
substance a criminal prosecution. As said by Senator Sar-
gent in *Belknap's Case*, p. 87: "A sentence to disqualifi-
cation is a humiliating badge affixed to high crimes and
misdemeanors in office." While we have in this country
no technical attainder working a corruption of blood, the
sentence of disqualification to hold or enjoy any office of
honor, profit, or trust, which is provided by our constitu-
tion in case of conviction by impeachment, is within the
primary definition of the term.. It is the extinction of
civil rights and capacities, a mark of infamy by means of
which the offender becomes *attinctus* or *blackened*. (Rap.
& Law., Dic., title "Attainder"; Bishop, Crim. Law, 966,
970, and notes.) The allegation that the respondents acted
willfully and corruptly being without support, it follows
that there is a failure of proof with respect to specifica-
tion 3.

8. The 6,000 fire-brick and six barrels of fire clay de-

scribed in specification 4 were used in the resetting of two boilers belonging to the state and which are to be used in the heating of the new cell house. The contention of the managers is that it was the duty of Mosher, the lessee of the penitentiary, to reset these boilers at his own expense. The provision in the act of 1877 under which the lease was executed is that the lessee shall pay "all penitentiary expenses, including salaries of officers and other help, the heating of buildings, boarding and clothing convicts." The contract is in the following language: "Said Stout agrees to board and clothe all such convicts in the manner prescribed by law, and to pay and defray all expenses necessarily incurred in maintaining said penitentiary, * * * and to restore said buildings, yards, and grounds, at the end of said term, in as good condition as they now are, reasonable wear and tear, loss by fire, etc., excepted." Whether under the above provisions the lessee was at his own expense bound to set boilers for a building not in existence and not contemplated when the contract was executed is to say the least a debatable question. Nor are we now called upon to review the action of the board for the purpose of determining whether their construction is the sound one. It is sufficient that they acted in good faith.

9. It appears that from January 20 to February 1, 1892, inclusive, work on the cell house was suspended for want of material and the convicts assigned to that work remained idle. It appears further that Dorgan, the superintendent, rendered a bill for their labor at $1 per day during all of said time. He attempts to justify his action by reference to a custom to charge subcontractors for the labor of convicts from the time of their assignment unless sick or disabled. This explanation merely proves the wisdom of the scriptural saying that one cannot serve two masters. Dorgan was appointed to employ laborers by the day and not to make time contracts for labor. In other words, the state was not a subcontractor and was liable only for labor actually

performed.  But the state board relied upon the time book kept by the warden and his subordinates, who were in the habit of keeping time for the lessee and the several sub- contractors, and in this instance, following the custom above referred to, daily charged to the state all the men who had been assigned to the cell house.  The bill therefor was al- lowed in the belief upon apparently reliable evidence that the services had been rendered as charged and their action is therefore not impeachable.

10.  The only specific charge in specification 6 is the crediting of Dorgan for money expended without requiring the production by him of vouchers therefor.  The method adopted by the board in dealing with Dorgan was substan- tially as follows: With each estimate made by the latter he would file with the board the original bills rendered to him for stone and other material, also receipted expense bills for freight, and at the same time exhibit his canceled checks payable to the order of the parties furnishing labor, material, etc.  Such checks, after being examined, were re- turned to Dorgan, but are all in evidence except two which are admitted to have been lost or mislaid.  There was in reality no settlement or statement of the account between them, settlement by mutual understanding having been de- ferred until the termination of Dorgan's employment. While we may not be able to commend the course of the respondents as prudent and sagacious business men, they are not to be convicted because we may differ with them in judgment or because they may fall short of our standard of efficiency and diligence under like circumstances.

11.  The only charge in specification 7 is the failure to make final settlement with Dorgan.  The respondents all testify that soon after the appointment of Hopkins they received information which led them to question Dorgan's honesty; that they had no means of ascertaining the truth with respect to such charges, and inasmuch as the grand jury of Lancaster county had entered upon an investigation

thereof, they decided to defer action in order to avail themselves of any information derived by that means as well as from other sources. The delay, it is apparent, does not constitute a misdemeanor in office but was for the best interest of the state.

12. We come now to a consideration of the charges under article 2, the first of which is the conversion to their own use by the respondents of $500 of the cell house fund. In this connection it is necessary to again examine the apparatus in question. It is doubtful if the history of the state presents another such an instance of reckless legislation as the appropriation of $40,000 without direction even as to the quality or dimensions of the building provided for, or as to the manner in which the money should be drawn or disbursed. There is no authority in the act for the procuring of material or plans and specifications. As to all matters except labor the board are required to exercise their discretion. In the exercise of that discretion they might lawfully have employed a supervising architect skilled in the construction of prisons and familiar with improved systems of ventilation and other methods of bettering the sanitary condition of such institutions, and for such service they might lawfully have expended several times the amount above named. They were advised by the attorney general that it was lawful to use a part of the cell house fund to defray the cost of visiting other prisons in order that they might better discharge their duty to the public. Whether or not such advice was technically correct is not the test of their liability in this prosecution. If they in good faith construed the law as authorizing them to use a part of that fund for the purpose named, there is no precedent in this country for declaring their offices forfeited because we might in a proper proceeding feel constrained to reverse their ruling, and place a different construction upon the act. It is in evidence that no itemized account of their expenses was ever filed with the board or submitted

to the legislature. But each of the respondents and the warden testify that the money was all expended for traveling expenses and other necessary costs of the trip, and that in addition to the $500 used for that purpose, each expended from $15 to $40 of his private funds. According to their testimony they were absent about two weeks; that. the three respondents had free transportation from Lincoln to St. Louis and from Chicago to Lincoln, and that the warden rode on a pass from Chicago to Lincoln. We are on this evidence alone asked to find that their legitimate expenses were less than $500 and draw the inference that they converted a part of that amount; in other words, that they are guilty of embezzlement. It should be remembered in the first place that this is a criminal prosecution and we are not to enter upon the field of conjecture in search of a theory upon which the respondents may be pronounced guilty. Second, they are not contradicted by any evidence whatever. They were not even subjected to a cross-examination regarding the items expended. I must not be understood as holding that upon an accounting they may not be chargeable with a part or all of the $500 in question, but a finding of willful conversion in this case must rest upon suspicion alone, or at most a mere probability and upon evidence insufficient to support a verdict in a civil action.

13. Substantially the same reasoning is applicable to the charge contained in the next specification, viz., the allowance of $200 out of the cell house fund to defray expenses of the chaplain and warden of the penitentiary as delegates to the prison congress at Pittsburgh. In my opinion that expenditure was outside of the scope of the authority of the board and that they are liable to the state for the money so advanced. In other words, they cannot, as to that amount, claim immunity on the ground that their action was in its nature judicial. Such act, however, falls far short of a misdemeanor in office. They acted from motives of humanity, without thought or possibility

of gain or advantage to themselves, which is alone a sufficient defense.

I am convinced that the alleged frauds at the penitentiary and the asylum for the insane were the real inducements for this prosecution, and that the two charges under article 2 are mere incidents, which would not, in the minds of the legislature, have justified the impeachment of the respondents.

14. The specifications under article 3 all relate to overcharges for coal at the asylum, and the questions presented thereby have been fully discussed in the consideration of specification 3, article 1. But in view of the importance of the case it is deemed proper to examine some of the remaining specifications. It should be mentioned in this connection that the superintendent of the asylum had held the position for many years by appointment from the governor. He was a man of high character and standing, and whose integrity was never questioned during the trial. It was his duty to order supplies for the asylum and he was presumed to know what amount thereof had actually been delivered. In allowing bills for coal, the respondents, following the practice which had prevailed for many years, required the superintendent to examine all accounts which were rendered in the form of vouchers and when found correct to "O K" them, that is, to certify that they were correct and that the supplies charged had been delivered. Following is the form of certificate which accompanied each coal voucher:

"Hospital for the Insane, Lincoln.    *    *    *    *    I certify that the within account is just and correct, and that it is a proper and necessary expense and has not been paid.

"W. M. KNAPP, *Superintendent.*"

At the regular monthly meetings of the board said vouchers were examined and the prices charged therein compared with the contracts in pursuance of which the supplies were furnished. If they were found to corre-

spond and the extensions correct they were allowed, but if they lacked the certificate of the superintendent, or if was discovered therein any substantial error, they were rejected. It was not only impracticable but manifestly impossible for the respondents to scrutinize every item thus certified to them by the heads of the eleven institutions under their charge. It is not seriously denied that the board may within reasonable limits rely upon the statements of the superintendents. It is argued, however, that the excessive amount of the coal bills for the year 1891 was alone sufficient notice to the board of the frauds alleged. It is evident that outrageous frauds were perpetrated upon the state during the period covered by the charges, and that the vouchers certified by the superintendent were, through his negligence or credulity, grossly in excess of the amount of coal actually furnished, although the amount of such overcharges cannot be accurately determined from the proofs. It may be admitted, too, that had the total amount of the coal bills for that year been presented for allowance at any one meeting, the extravagance thereof was such as to have challenged their attention, notwithstanding the certificates of the superintendent and their confidence in his watchfulness and integrity. But the vouchers were presented for allowance at the monthly meetings and in view of the hundreds of bills examined at each meeting, in the disbursement of $450 000 yearly for current expenses and $225,000 for the erection of public buildings, it is not surprising that the excessive charge for coal at the one institution should have escaped detection.

There is another fact which is worthy of notice. Coal bills amounting to over $12,000 for the last quarter of 1890, which was prior to the term of office of either respondent, and the first quarter of 1891 remaining unpaid, the appropriation for that biennial period having been exhausted, were submitted to the legislature of 1891, and by it referred to the proper committees for investigation

and report. And by an act approved April 6, 1891, the sum of $12,000 was appropriated for the payment of said bills, whereupon they were certified to by the super-intendent and allowed by the board. In specification 7, relating to the overcharge during said period, it is stated, in substance, that the coal delivered was 2,996,000 pounds only, while the bills rendered by the contractor amounted to 6,886,000 pounds, and which was allowed by the board after deducting 80,000 pounds, leaving a net overcharge of 3,410,000 pounds in six months. The aggregate of the bills rendered during the remaining nine months of that year is 8,113,700 pounds, or 1,627,700 pounds more than the amount approved by the legislature for the six months in question. The overcharge for the first three months of the respondents' term of office which the legislature failed to detect was 2,020,000 pounds, while for the remaining nine months, according to the specification, it is less than twice that amount. It is not contended that negligence of the legislature, however gross, would excuse the willful disregard of duty by the respondents, but there is force in the argument that the appropriation in question is in the nature of a legislative assertion of the reasonableness of the charges, and that since the respondents are admitted to have acted in good faith, they are not chargeable with frauds by the contractor of such character as to escape de-tection when subjected to the scrutiny of an unfriendly legislature. The appropriation of money for the payment of the bills named was a legislative approval of the ac-counts under the circumstances of the case, and is a complete justification of the action of the board in ordering them to be paid. So that the legislature of 1893 is placed in the illogical and paradoxical position of impeaching the state board for an act which was expressly authorized, if not in terms commanded, by the legislature of 1891. True, the respondents might have justified a refusal to pay the bills, if tainted with fraud, to their knowledge, but having

in good faith carried out the direction of the legislature it cannot be said that such act amounts to a misdemeanor in office within any modern definition of the term.

The other specifications under article 3 all relate to overcharges for coal at the asylum, and what has been said with reference to the other like charges applies with equal force to them.    The vouchers were all presented to the board in the usual course of business, at the regular monthly meetings, bearing the certificates of the superintendent.    They were all compared with the contracts on file, and allowed without any knowledge or suspicion on the part of the board that the coal called for had not been delivered.

Every controversy is important to the parties immediately concerned, and this is no exception.    But the questions whether these respondents or others shall serve the people, and the effect of a conviction upon them, are of small concern compared with the principle involved.    It is useless to indulge in platitudes with regard to public trusts, or the binding obligations of an oath of office.    A favorite argument in state trials three hundred years ago was that if the accused should be acquitted of the misdemeanor charged, no one was impeachable, and the fact that it was frequently employed during this trial, proves that history repeats itself.    It was then as it is now, the plea of necessity, the argument used when reasons were wanting.    According to the definition of official misdemeanors contended for by the state and which must be adopted to warrant a conviction, it will be within the power of an aggressive majority of the legislature at any future time to secure the removal of an obnoxious officer.

It has been truly said that impeachment is an heroic remedy to be resorted to in extreme cases.    The only precedents which tend to sustain the position of the managers are early cases in England while the law of impeachment was in a state of evolution, and which have never been

recognized as authority in this country. It may also be asserted as a fact known to every student of English constitutional history that the decadence of impeachment as a remedy in England dates from about the time the house of lords became illustrious for the learning and character of its members, and that it is now practically obsolete in that country.

As said by Prof. Dwight, 6 Am. Law Reg., 282: "The dramatic period of English history has passed away. There have been no impeachments for fifty years and doubtless will be none of special importance unless a revolution takes place." And the words of the late Justice Miller in speaking of Johnson's impeachment are quite as applicable to this: "It may also be said that in view of the invitation which a successful result in that effort to convict and remove him would have held out in future times to exasperated majorities in the legislative body opposed to the president, and his manner of exercising the functions with which he is charged by the constitution, to get rid of a president against whom such personal hostility existed, the country is fortunate in the fact that the great impeachment failed." (Miller, Const. Law, 172.) It is better that the state should be confined to the remedy afforded by the Criminal Code and civil action on the bonds of its officers, than an alternative so dangerous and so liable to abuse as impeachment for technical violations of law, errors of judgment, mistake of fact, or even neglect of duty such as disclosed by the proofs in this case. It follows from the views expressed that the evidence fails to establish the essential facts charged in the several articles of impeachment and that a judgment of not guilty should be entered in favor of each respondent.

JUDGMENT ACCORDINGLY.

NORVAL, J., concurs.

State v. Hastings.

Maxwell, Ch. J., dissenting.

In 1891 one C. W. Mosher was receiving from the state forty cents per day for the board, clothing, care and attention of each convict in the penitentiary. He was also entitled to their labor and the convicts were hired out to various persons at the rate of about forty cents per day for each convict. In 1891 an appropriation was made for building a new cell house by days' work, $40,000. This, like all other appropriations, was for "so much thereof as may be necessary." That is, a sum total of $40,000 was appropriated with the condition that only so much thereof as was necessary should be drawn. This is a condition of all appropriations in this state. The warden seems to have protested against the employment of persons outside of the penitentiary to construct the building on the ground that it had a demoralizing effect on the convicts. The result was that the respondents agreed that the building in the main was to be constructed by convict labor. W. H. Dorgan was Mosher's superintendent at the penitentiary, and had full authority to hire the convicts to any person who desired to employ them. Daniel Hopkins was the warden of the penitentiary from May 5, 1891, to about March 1, 1892. He recommended Dorgan to the respondents as a suitable person on behalf of the state to superintend the construction of the cell house. Dorgan testified as to his relations to Mosher as follows:

"Well, I looked after all the business connected with it —that is, all his interests at the prison. That would include all kinds of supplies, subletting the men, and looking after his business in general."

The order making the appointment is as follows:

"The construction of the cell house for the penitentiary as provided for in the general appropriation bill, wherein $40,000 has been appropriated for that purpose by the twenty-second legislature, to be done by days' labor, being

12

under consideration, Hill moved that W. H. Dorgan be employed by the board as superintendent of construction with power to purchase material for construction, and employ laborers for building subject to approval of the board. Seconded by Allen. Motion carried.

"Allen moved that Dorgan be required to furnish bond for the faithful performance of duty in the sum of $10,000. Seconded by Hill. Carried.

"On motion of Allen the salary of Dorgan as superindent was fixed at $50 per month, to begin from this day."

Mr. Dorgan gave bond with approved sureties in the sum of $10,000. He was not a builder, and possessed no practical knowledge of building or building-material.

The new cell house is the east wing of the penitentiary and is substantially similar in all respects to the west wing of the main building. The new wing is 220 feet in length by forty-five feet in width, and about thirty-eight feet in height. Being directly east of the main building no wall was necessary at the west end, and there was a wall about twenty-two feet in height on the north and also on the east of the new wing which it was intended to use as the north and east wall and raise the same to the desired height. So that at that time the only walls supposed to be necessary were the south wall, and in addition to raise the east and north walls to the height of the other walls, and put a roof on the building with ceiling preparatory to receiving the cells. This, however, will be discussed later. The board seem to have given Dorgan no directions in regard to the building but left him to do as he pleased. Soon after his appointment Dorgan entered into a contract with S. H. Atwood & Co. for stone for the building, the price being thirty-five cents per cubic foot for dimension stone plugged to size. This was defined by the witnesses as stone split from layers of the proper thickness by drilling holes in the rock and driving wedges therein. Another quality of rock

he paid Atwood & Co. sixteen cents per hundred pounds, and still another eight cents per hundred pounds. The rock to be delivered at Cedar Creek or at other points not more distant from Lincoln, the freight to be paid by the state. Dorgan, according to his statement, made no inquiry of others as to the price of stone. A large part of the stone was in fact purchased by Atwood & Co. of J. W. Zook, of Nemaha county, and delivered on board of the cars at Johnson, in that county, at from three cents per hundred pounds for rubble to ten cents per cubic foot for dimension stone plugged to size. Zook testifies that Dorgan wrote to him about the price of stone some time before he sold to Atwood & Co.; that he had lost the letter. He says:

A. He asked the price of stone delivered at Lancaster.

Q. And what did you tell him?

A. I told him I sold stone delivered on board the cars at the switch at ten cents a foot and if I delivered it on board the cars at Lancaster the freight would be added and that is what the letter contained.

Q. Do you remember about what time that was? Was it before or after the time you sold the stone to Atwood?

A. As near as I can remember that was about a week before Atwood came down there.

He also testifies:

A. I have been in the stone business about ten years.

Q. What has been the uniform market value of this dimension stone free on board the cars at that point?

A. Ten cents a foot and I sold some dimension stone for even less money than that. If I get ten cents I consider I was getting a fair price.

He testifies, in effect, that he wrote to Dorgan to that effect before Atwood & Co. purchased the stone from him and that he enclosed the letter in an envelope, duly stamped, and containing his business card asking for a return of the letter if not called for and that it was never returned. Dorgan, while attempting to deny that he received the let-

ter, does not deny absolutely that he did receive it. On cross-examination he testifies:

Q. My memory is that I asked you if you had received any letters from J. W. Zook, of Nemaha county, relative to stone from that point?

A. No, I don't think that I did.

Q. You don't think that you received any letters?

A. No.

Q. You were subpœnaed to bring them, but you don't think you received any?

A. I have no such letters in my possession, and I don't think I ever had.

This is far short of an unequivocal denial. Atwood & Co. also purchased a quantity of stone from Van Court and Keys, in Nemaha county, for the penitentiary at a slight advance over the price paid Zook. But suppose Dorgan's denial is unequivocal, still the probabilities are that Zook sent the letter to Dorgan as he testifies. Dorgan was anxious to justify his purchases of stone and to shield the respondents. He pleads ignorance of the price of stone as a justification for paying more than twice as much as it could have been purchased for. His ignorance on that point has the appearance of being assumed; and to admit that he had received the letter would, in effect, be a confession that he did know the price. On the other hand, Zook is a disinterested witness, of fair appearance. He was anxious to find a market for his rock. He testifies fully and unequivocally that he sent a letter, duly stamped, to Dorgan, at Lancaster where Dorgan received his mail, offering to furnish stone at ten cents per cubic foot for dimension plugged to size, and three cents per hundred pounds for rubble, all free on board the cars at Johnson, Nemaha county; that this letter had his return card on it and that it never was returned. That this testimony is true there is not a shadow of a doubt and it with other things shows how utterly unreliable is Dorgan's testimony.

The purchases of stone from Atwood & Co. are as follows:

### AUBURN STONE.

| | |
|---|---:|
| 453.64 ft. at 35c per ft................................. | $158 77 |
| 3,145.92 ft. at 35c per ft.............................. | 1101 07 |
| 2,208.27 ft. at 35c per ft.............................. | 772 90 |
| 316,500 lbs. dim., 3,165 ft. at 16c per ft.......... | 506 40 |
| | $2,539 14 |

### CEDAR CREEK STONE.

| | |
|---|---:|
| 2 cars, no weight or quality .......................... | $50 00 |
| 958,900 lbs. rubble at 6c.............................. | 575 34 |
| 120,400 lbs. footing at 8c............................. | 96 32 |
| 111,400 lbs. crushed at $1.10........................ | 45 38 |
| 85,700 lbs. coping at 16c.............................. | 137 12 |
| 68,500 lbs. dim. at 10c................................ | 68 50 |
| 124,000 lbs. rubble at 8c ............................. | 99 20 |
| 187,100 lbs. rubble at 8c.............................. | 149 68 |
| 76,000 lbs. dim. at 10c................................ | 76 00 |
| 29⁴⁄₉ ft. at 74c. ......................................... | 7 00 |
| 197,200 lbs. rubble at 8c.............................. | 157 76 |
| 67,200 lbs. rubble at 8c .............................. | 53 76 |
| 598,700 lbs. rubble at 8c.............................. | 478 96 |
| 318,400 lbs. rubble at 8c.............................. | 254 72 |
| | $2,249 74 |

### JOHNSON STONE.

| | |
|---|---:|
| 281,700 lbs. dim., 2,817 ft. at 16c per ft.......... | $450 72 |
| 311,800 lbs. dim., 3,118 ft. at 16c per ft.......... | 598 88 |
| 90,050 lbs. dim., 990½ ft. at 16c per ft........... | 158 48 |
| 34,000 lbs. dim., 340 ft. at 16c per ft............. | 54 40 |
| 649,100 lbs. dim., 6,491 ft. at 16c per ft......... | 1,038 56 |
| | $2,201 04 |
| | $6,939 92 |

Price of stone paid by Hopkins to Atwood & Co.:

Rough ashler, 1,332 ft. at 16c per ft................ $213 12

Dimension, 4,640⅘ ft. at 35c per ft................ 1,624 28

$1,837 40

Total paid to Atwood for stone........... $8,827 32

The amount so paid to Atwood & Co. was about twice as great as the same quality and kind of stone could have been purchased in the open market and the state thereby lost while Dorgan was superintendent more than $3,000, and as Hopkins continued to receive stone under the Dorgan contract the loss to the state exceeded $4,000.

On the 1st day of June, 1891, Mr. Dorgan made what he calls an estimate for $6,100, as follows:

"ESTIMATE No. —.

"For work done and material furnished during the month of May, 1891, for cell house at penitentiary:

Cut stone..............................................$1,000

Concrete................................................... 750

Excavating ............................................... 350

Material on hand not used............................. 4,000

Balance due contractor................................ 100

"The above estimate was made by me this 1st day of June, 1891, and I hereby certify that the amount of work done and materials furnished by said contractor are true and correctly stated and set forth in the above estimate, and that the said estimate is made in the manner and according to the plans and specifications mentioned in the contract with the said state and said contractor.

"W. H. DORGAN, *Superintendent.*

"Signed in my presence and sworn to before me this — day of ——, A. D. 18—.

"Approved by the board of public lands and buildings.

"—— ——,                              —— ——,

"*Secretary.*                              *President.*

"General Fund.

"THE STATE OF NEBRASKA,
                              "To W. H. DORGAN, Dr.

"For material used in building new cell house, per
     estimate No. 1 hereto attached....................... $6,100

"Examined and approved June 1, 1891, by the board
of public lands and buildings, and account to be charged to
appropriation for penitentiary, new cell house.

     "JOHN C. ALLEN,            A. R. HUMPHREY,
          "*Secretary.*                *President.*"

This was approved and warrant drawn for the amount.
He also at the same time submitted the following account:

                    "LINCOLN, NEB., June 1, 1891.
"MR. W. H. DORGAN, *Supt.,*
                    "In account with PRISON CONTRACT.

To 357 days at $1 ..................................... $357 00
     26 days, team at $3 .............................    78 00
     lumber for stone shed...........................   100 00
     carpenter work ..................................    18 00
     6 wheelbarrows at $1.50 .........................     9 00
     nails and mason line.............................     9 95
     $\frac{1}{2}$ dozen squares......................     3 00
     $\frac{1}{2}$ dozen shovels......................     6 00
     2 cars stone ....................................    50 00
     excavating .......................................   350 00
     switching and unloading 14 cars ...............    56 00
                                                       _____
                                                       $1,036 95

          "Received payment,      PRISON CONTRACT."

A similar estimate for June, 1891, for $8,000, was made
on the 3d day of July, 1891, and similar account filed,
which were approved and warrant drawn.   The third esti-
mate and account were filed October 5, 1891, for $8,000,
and were approved and a warrant issued thereon.   The
fourth estimate and account for $5,000 were filed and ap-
proved December 7, 1891, and warrant drawn.   The fifth

estimate and account were filed March 7, 1892, and a warrant issued. It will be seen that he had thus drawn from the treasury upon these various estimates the sum of $32,-100, without, so far as appears, a single voucher from the persons who had furnished the labor or material, or their assignees.

Section 19, article 5, of the constitution, provides: "The commissioner of public lands and buildings, the secretary of state, treasurer, and attorney general shall form a board, which shall have general supervision and control of all the buildings, grounds, and lands of the state, the state prison, asylums, and all other institutions thereof, except those for educational purposes; and shall perform such duties and be subject to such rules and regulations as may be prescribed by law."

Section 4, chapter 83, article 7, Compiled Statutes, provides: "The said board shall have power, under the restrictions of this act, to direct the general management of all the said institutions and be responsible for the proper disbursement of the funds appropriated for their maintenance, and shall have reviewing power over the acts of the officers of such institutions, and shall, on the part of the state, at regular meetings as hereinafter directed, audit all accounts of such officers, including the accounts of the commissioner of public lands and buildings, except his salary."

"Sec. 5. At the regular meeting of the board it shall be their duty to examine the accounts of the public officers contemplated in this act and to determine whether the same are entitled to be paid out of the moneys appropriated for the purpose of maintaining the institutions for which they are charged, and if correct, shall approve the same, which approval shall be signed by the president and countersigned by the secretary under the date of such action; and if the accounts be incorrect, exorbitant, or not entitled to payment from such appropriations, the same shall be disapproved and returned to the claimant, such board keeping a record of the same.

"Sec. 6. When the accounts above mentioned have been filed with the board, and shall have been audited and approved by them, the auditor of public accounts is hereby authorized and directed, upon the presentation to him of such accounts so authenticated, to issue his warrant on the treasurer against the proper fund or appropriation, for the amount therein stated, to the claimant or his assignee. And no accounts coming under the provisions of this act shall be entitled to payment until they have been so approved by the said board."

Section 6, chapter 83, article 3 provides: "All persons having claims against the state shall exhibit the same, with the evidence in support thereof, to the auditor, to be audited, settled, and allowed within two years after such claims shall accrue; and in all suits brought in behalf of the state, no debt or claim shall be allowed against the state as a set-off, but such as has been exhibited to the auditor, and by him allowed or disallowed, except only in cases where it shall be proved to the satisfaction of the court that the defendant, at the time of trial, is in possession of vouchers which he could not produce to the auditor, or that he was prevented from exhibiting the claim to the auditor, by absence from the state, sickness, or unavoidable accident; *Provided,* The auditor shall in no case audit a claim or set-off which is not provided by law."

Section 8 requires all warrants, vouchers, etc., to be preserved in the office of the auditor.

Section 2, article 8, of the same chapter requires the auditor to keep an account of all claims presented to him for an examination and adjustment, and provides for appeals by any party aggrieved. All claims against the state are to be presented to him and must have his approval before a warrant can be issued. This means the primary claims—those of persons who furnish the goods, labor, etc. It is true in expenditures contracted by the board of public lands and buildings they must approve—that is, certify all

vouchers for such expenditures before the auditor can be required, to act upon them. This is a precaution to prevent frauds by requiring the board that contracted the debt to certify that the claim is correct. It does not change the character of the voucher, however, as that is to be for the original claim. (*State v. Moore*, 36 Neb., 579.)

In the case at bar the respondents, on mere estimates and without vouchers, allowed Dorgan to draw money at his pleasure. The board itself could not draw money from the treasury except upon proper vouchers and it had no authority to authorize Dorgan to do so. Should the mode adopted in this case become the rule, every precaution for the protection of taxpayers would be broken down, the constitution and statutes set at naught, and money unlawfully and in defiance of law taken from the treasury.

The testimony of Hopkins shows that at the time he was appointed superintendent, on March 16, 1892, Dorgan had built the south wall and one-third of the east wall, and that was substantially all that was done. Hopkins testifies on cross-examination:

Q. How far had the cell house progressed at the time you took charge as superintendent?

A. The north wall of the cell house was completed and part of the east.

Q. Do you mean the north or south wall?

A. I should say the south wall of the cell house.

Q. And a part of the east wall?

A. And a part of the east wall; yes, sir.

Q. The north wall had not yet been torn down?

A. No, sir; we hadn't commenced on that. I should have said the south wall.

Q. Was the south wall clear up?

A. Yes, sir.

Q. How far was the east wall?

A. Why it was perhaps one-third.

. He also testifies that "the grates were put in the south wall and the door was hung also—the large door."

This testimony does not seem to be denied.  The experts called to place values upon the several walls of the building, and the whole as it now stands, differ greatly.  The five called from Lincoln all place the values of the several parts, including material, very much lower than the experts called from Omaha.  Thus, Mr. Bullock, a builder of Lincoln, placed the value of the south wall at $6,472, while Mr. Coots, a builder of Omaha, estimates the value complete in round numbers at $10,472.35.  He also estimates the east wall complete at $2,797.95.  It is difficult to reconcile the various estimates of the experts, as it would seem there should not be so much difference in estimated values.  Perhaps in arriving at an approximate value it would be well to take the average of the estimates, which would be $8,437.18 for the south wall complete.  Coots estimates the value of the east wall complete at $2,797.95, one-third of which would be $910.99.  Therefore, all the work performed under Dorgan's superintendence, had it been performed by free labor, would have been worth $9,348.07, but having been almost wholly performed by convict labor the actual cost could not, even at $1 per day for convicts, have exceeded $8,000.  It also appears that there were plans and details prepared for which it is claimed $350 were paid.  There was some stone on hand, the amount thereof does not clearly appear.  It could not have been very large, however, because Hopkins, after he became superintendent, purchased stone of Atwood & Co., as heretofore stated, to the amount of $1,837.35.  At the time Dorgan ceased to be superintendent all the stone that was supposed to be necessary was sufficient to complete the east wall and to raise the north wall to the same height as the south wall.  But suppose we estimate the stone on hand at $2,000 and the value of the south wall at $10,000, and the aggregate of the work, had it been performed by citizen labor, would be

$13,260. which would include everything, and for this Dorgan had received $32,100, and as there were no funds in the treasury the amounts were drawing interest at seven per cent.    But the work on the south and east walls was almost wholly performed by convict labor.    The testimony shows that convicts would perform from one-half to two-thirds as much labor as was performed by citizens.    So that the actual cost of the wall, including superintendence, must have been very much less than the above estimate.

In March or April, 1892, after Hopkins was appointed superintendent, he removed the cap-stones from the top of the north wall, when it was discovered that there were no binders in the wall and that the mortar possessed no adhesiveness—was worthless, and that it would be unsafe to build on it.    The respondents were thereupon consulted and found it necessary to consent to the tearing down of the wall and rebuilding the same, and this was done under Hopkin's direction.    Dorgan had nothing to do with this or putting on the roof, and all evidence as to the cost and value of the north wall, roof, etc., are not in issue in this case, nor of the building as it now stands, as there is no charge against Hopkins.    Dorgan returned to Hopkins the sum of $6,331.15.    Dorgan has received and has retained $25,768.85.    The state was charged $1 per day for the convicts, although other contractors paid but forty cents.    It was alleged that the state had the choice, and that the men selected for the state were experienced stone masons, and therefore more valuable than the average convict.    This is shown to be true of eight or ten of those employed, but not generally.

M. D. Welch, president of the Western Manufacturing Company, testified that he employed ordinarily about one-half of the convicts.

Q. You have practically *carte blanche* as to selection of the men?

A. Yes, I have.

Q. You have your pick of the men in the penitentiary?

A. Well, that is to say, I don't take cripples or diseased men if I can help it, nor short time men.

Q. You take long time men—good, strong, healthy fellows?

A. Yes, in my business I want to pick a man that when he gets familiar with the work he will be worth something. It takes some time to learn them.

He also testifies that he pays forty cents per day for each convict employed, and furnishes them tobacco, candles, chewing gum, etc., in addition. The wages paid by him appear to be the ordinary wages, and the proof fails to show that on any contract that continued for a considerable time were greater wages paid.

There are charges that more days' work were charged to the state than were rendered. That some such were charged there is no doubt, but the extent of such charges cannot be determined, although the amount paid was considerable. There would seem to be no reason why the state should be charged for labor not performed or a greater rate than forty cents per day, and with a capable, intelligent, disinterested superintendent of the work and proper effort of the respondents, fictitious services would not have been charged, and no more would have been paid for the convicts who worked for the state.

The appointment of Dorgan, whose interests were altogether with Mosher, is entirely unjustifiable. If the board was busy, as it claims to have been, there was all the more necessity for the appointment of a capable, disinterested superintendent who could be relied upon to look after the business and interest of the state. No ordinarily prudent man would have appointed Dorgan to fill the position of superintendent nor placed in his hands tens of thousands of dollars; and it is not surprising that the state has suffered serious loss. It seems that Hastings was absent when Dorgan was appointed; that he had selected a disinterested

person named Davey and had promised him the position. But after his return he visited the penitentiary and claims to have found everything satisfactory and right, and concluded to retain Dorgan. No man can serve two masters, and this case has proved no exception to the rule.

That there were frauds in the flour contract there is no doubt, but the extent of such frauds it is difficult to determine. Thus, in January and February, 1892, the flour was weighed, it is claimed, and the only record preserved was the stubs of the weigh checks, and they are lost. There is also proof that the drayman was in the habit of leaving a number of sacks of flour at a designated place on the way to the asylum.

The charges under these heads are fully sustained.

2. It appears that while Dorgan was possessed of the money in question, he, at the request of the respondents, paid to Hopkins $200 to enable him and Elder Howe to visit the prison congress at Pittsburgh, Pennsylvania. Soon afterwards the board received from him $500 of the money belonging to the state to pay the expenses of a visit to various points to enable them to choose the best cells. This was charged to the cell house fund. These appropriations are justified upon the ground that the state would be benefited thereby, and that therefore it was a proper expenditure.

Section 22, article 3, of the constitution, provides: "No allowance shall be made for the incidental expenses of any state officer, except the same be made by general appropriation and upon an account specifying each item. No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law and on the presentation of a warrant issued by the auditor thereon, and no money shall be diverted from any appropriation made for any purpose or taken from any fund whatever, either by joint or separate resolution. The auditor shall, within sixty days after the adjournment of each session of

the legislature, prepare and publish a full statement of all
moneys expended at such session, specifying the amount of
each item, and to whom and for what paid." This pro-
vision declares that "No money shall be drawn from the
treasury except in pursuance of a specific appropriation
made by law and on the presentation of a warrant issued
by the auditor thereon." The legislature makes appro-
priations. It is for it, composed as it is of the representatives
of the people, to say what is for the interest of the state
and requires the expenditure of money. Unless it grants
the authority there is none. If an officer, or a number of
them, can take $1 without an appropriation and be justi-
fied in doing so, he or they may take all that there is in
the treasury if in their view the state will be benefited
thereby. Money taken without an appropriation is taken
not only without law but in defiance of it, and if the prin-
ciple is once established, would lead to gross frauds and
peculations. Suppose trustees having the care of property,
and were receiving the rents and profits, should desire to
visit distant points to enable them to administer the estate
with wisdom and prudence and thereby benefit it, could
they charge this expense upon the owner or beneficiaries
without their consent lawfully expressed? No more can
they do so in this instance. The state, through its legis-
lature, must give its assent to an expenditure, otherwise
the party must pay it out of his own pocket. No voucher
was filed with any officer showing the amount expended,
nor any attempt to comply with the law. In addition,
this cell house is not ready for the cells even now; there-
fore, there was no emergency. But under no view of the
case can the expenditure be justified, and the fact that in
one or two previous instances such expenditures were made,
which do not seem to have been known, but tend to show
the lax methods that seem to have prevailed with the board
wherever the expenditure of money was concerned. It
also appears that the legislature made an appropriation of

$1,000 for the traveling expenses of the board. It is true Mr. Allen testifies that $500 of this sum had been expended. He also testifies that all the members had passes, so their railroad fare was nothing. So far as he stated the visits to the various institutions by the board, the expenditures should not have exceeded $100, and probably did not. If the board desired to travel on official business it would seem that this was the fund for that purpose. It appears also that Dorgan used $234 to reset the boilers in the prison, a charge which properly belonged to Mosher, and should have been paid by him.

In addition to the ordinary provisions in appropriation bills, that of 1891 contained the following:

"Sec. 3. Each state officer and each board entitled to draw against the appropriation provided for in this act shall keep an itemized account of all expenditures made by them and report the same with vouchers to the finance committee of the next legislature, and no officer of institutions and no state officer shall incur any indebtedness beyond the amount appropriated in this bill except to prevent disaster."

The testimony shows that the respondents made no attempt to comply with these provisions. The charges are fully sustained.

3. The testimony tends to show that gross frauds were committed in the delivery of coal at the Lincoln insane asylum. The respondents claim to have been ignorant of these frauds until about September, 1892. It appears that from the 1st day of October, 1890, to the 26th day of March, 1891, the Whitebreast Coal & Lime Company furnished coal for the asylum and was allowed therefor the sum of $11,551.95. To cover this claim an appropriation of $12,000, or so much thereof as might be necessary, was made, and the claim was certified to the auditor by the respondents. The coal was alleged to have been delivered on the cars at asylum switch, but the number and initials

of the cars on which it was alleged the coal was delivered are not given in a single instance.

Dr. Knapp testifies, in effect, that he did not believe the amount of coal charged had been delivered. His bookkeeper testified to substantially the same facts. Neither of them, however, communicated their suspicion to the respondents. Knapp afterwards approved the vouchers and they were approved by the respondents and the warrant issued. The fact that an appropriation had been made to pay for this coal was not an adjudication of the claim, as the legislature cannot adjudicate claims. (*State v. Babcock,* 22 Neb., 38.) The very large amount of coal charged—sufficient to have supplied all the asylums in the state for the time charged—certainly should have put the respondents upon inquiry. The reports for coal from the other public institutions were before them, and unless fraudulent vouchers were sent in from them also, of which there is no claim, a comparison should have shown the fraud. No examination was made, however. A specimen is seen in a voucher for July, 1891, as follows:

                                                    " General Fund.
"STATE OF NEBRASKA, HOSPITAL FOR THE INSANE,
                "To WHITEBREAST COAL & LIME Co., Dr.

| July | 4, | 32,000 pea, at $1.72 | $27 52 |
|---|---|---|---|
|  | 6, | 40,000 pea, at $1.72 | 34 40 |
|  | 7, | 2,050 Canon, at $6.90 | 7 07 |
|  | 8, | 112,000 pea, at $1.72 | 96 32 |
|  | 10, | 82,000 lump, at $2.59 | 106 19 |
|  | 10, | 41,000 pea, at $1.72 | 35 26 |
|  | 11, | 40,000 lump, at $2.59 | 51 80 |
|  | 14, | 41,000 lump, at $2.59 | 53 09 |
|  | 14, | 40,000 pea, at $1.72 | 34 40 |
|  | 15, | 2,720 Canon, at $6.90 | 9 38 |
|  | 16, | 40,000 pea, at $1.72 | 34 40 |
|  | 20, | 86,000 lump, at $2.59 | 111 37 |
|  | 22, | 2,680 Canon, at $6.90 | 9 24 |

13

| | | |
|---|---|---|
| July 23, 42,000 lump, at $2.59..................... | $54 | 39 |
| 24, 112,000 pea, at $1.72..................... | 96 | 32 |
| 25, 70,000 pea, at $1.72..................... | 60 | 20 |
| 28, 104,000 pea, at $1.72..................... | 89 | 44 |
| | $910 | 79 |

"I hereby certify that the above account is for supplies actually furnished the above named institution.

"(Sign here.)          WHITEBREAST COAL & LIME CO.

"JNO. T. DORGAN.

"Examined and adjusted.

"_____ _____

"*Auditor Public Accounts.*

"Per ——— ———, *Deputy.*

"Approved:

"_____ _____,

"*Secretary of State.*

"Per ——— ———, *Deputy.*

"Received of T. H. Benton, auditor of public accounts, warrant No. ——

"(Sign here also.)          WHITEBREAST COAL & LIME CO.

"JNO. T. DORGAN.

"DUPLICATE.

"HOSPITAL FOR THE INSANE,

"LINCOLN, 7–31, 1891.

"I certify that the within account is just and correct and that it is a proper and necessary expense and has not been paid.          W. M. KNAPP, *Superintendent.*

"Examined and approved August 3, 1891, by the board of public lands and buildings, and account to be charged to appropriation for fuel and lights.

"J. C. ALLEN,                          ——— ———,

"*Secretary.*                          *President.*"

Indorsed: "Nebraska Hospital for the Insane, Lincoln, Nebraska. Voucher No. ——. $910.79. Warrant issued on account of fuel and lights to Whitebreast Coal & Lime Co.                          T. H. BENTON,

"*Auditor of Public Accounts.*"

Betts, Weaver & Co. seem to have adopted the White-breast style of vouchers in November, 1891. The voucher for December, 1891, is as follows:

"General Fund.

"STATE OF NEBRASKA, HOSPITAL FOR THE INSANE,

"To BETTS, WEAVER & Co., Dr.

To 434,500 tons pea, $1.70............................ $738 22
  313,120 tons lump, $2.70........................  846 .72
   14,780  tons Canon, $6............................    86 33

$1,671 28

"Approved Jan. 4, 1892."

Other vouchers in that form were approved.

Contracts for coal were let every three months and the Whitebreast Coal & Lime Company and Betts, Weaver & Co. seem to have monopolized the business. From October 1, 1890, to December 31, 1891, and the month of February, 1892, the amount of coal alleged to have been delivered to the asylum at Lincoln was 17,551,907 pounds, and the amount actually received, so far as the evidence shows, was 7,589,600 pounds, leaving a shortage of 9,962,-307 pounds, which cost $12,855.47. The proof fails to show that the respondents in any manner profited by these frauds.

The respondents introduced evidence tending to show that last October they submitted the whole matter to the grand jury of Lancaster county, and thereby sought to bring the guilty parties to justice. It is but fair, however, to state that Governor Boyd requested them to lay the matter before the grand jury, and it is evident that the matter had acquired such publicity it could not be avoided. On this trial they in effect deny the frauds, or that, if such existed, they had any notice thereof in any form and therefore are not chargeable therewith. They seem also to exhibit no very friendly sentiments towards the witnesses by whom these frauds were proved, and certainly show no disposition to aid in procuring proof of the same.

Some reliance is placed on the approval of the asylum officers by the governor in his message of January, 1891. This, no doubt, is entitled to considerable weight, but it could not in any manner excuse the respondents from the exercise of reasonable care in the examination of the asylum vouchers. In addition to this, the land commissioner in December, 1890, in his report to the governor, which is in evidence, says (p. 86): "Under the existing system of furnishing supplies the appropriation funds are too frequently used in keeping with that conception of charity which declares that it 'hideth a multitude of sins.' Items for luxuries, privileges, and conveniences that are alone enjoyed by the officials and their friends are too often cloaked in a claim for 'board and clothing, fuel and lights,' or some one of the other necessary funds appropriated for maintenance of the institution."

It is contended by the respondents that the business in their respective offices has so increased that it is impossible to give attention to many of the details of business that come before them and therefore they are excusable. It is true there is a large amount of business in each of the offices named. This is a large and growing state and business in all departments is constantly increasing. In the office of the land commissioner, however, there are ten clerks and one deputy, which with the principal make twelve persons. In the office of the secretary of state, one deputy and two clerks, four persons in all. In the attorney general's office, one deputy and stenographer. If these officers need additional assistance, if they will present their claim to the legislature, through the governor, no doubt the desired increase would be granted. These facts must be known to the respondents, and as no such application was made it must be because it was not considered necessary. The business of the state, however, must be conducted in a reasonably prudent and careful manner, otherwise the result would be chaos. Suppose a merchant or

business man should urge the want of time to look after his business and therefore neglected it, the result would not be uncertain. No defense of this kind can be entertained.

4. Are these acts ground for impeachment? Section 5, article 5, of the constitution provides: "All civil officers of this state shall be liable to impeachment for any misdemeanor in office." It may be well to inquire first what are the duties of public officers? Each one, before entering upon his duties, is required to take an oath that he will "faithfully and impartially perform the duties of his office according to law, and to the best of his ability." An officer is bound to exercise ordinary care; such care as an ordinarily prudent man would exercise in the management of his own affairs. The respondents are, to quite an extent, trustees. They let contracts and certify claims each year to the amount of nearly $1,000,000. Now shall this work be performed faithfully to the best of the ability of each as he has sworn to do, or shall it be neglected and no examination made?

There is considerable conflict in the authorities as to what constitutes an impeachable offense. Under the common law, the grounds of impeachment are "high crimes and misdemeanors." In a number of cases under this law it has been held that the cause of accusation must be a crime punishable under the criminal law. In England, impeachment has been to some extent considered as a mode of trial to punish crime; although a judgment of guilty was no bar to an indictment and conviction for the same offense. In this country, while some of the cases hold that to constitute an impeachable offense it must be such as could be punished under the criminal law, yet in the majority of cases it is held that this requirement is unnecessary, and we are constrained to adopt the latter view. Judge Lawrence, in 6 Am. Law Reg., 649, in discussing the meaning of the word, says: "The word 'misdemeanor' has a common law, a parliamentary, and a popular sense. In a parlia-

mentary sense, as applied to officers, it means maladminis-
tration or misconduct, not necessarily indictable." "De-
meanor is conduct" and misdemeanor is misconduct in the
business of his office. It must be in matters of importance
and be of a character to show a willful disregard of duty.

Now do the acts above recited constitute misconduct in
office? We are not without authorities in this state on
that point. Thus in *Minkler v. State*, 14 Neb., 181, a
county surveyor, who acted on the honest belief that he had
a right to remove section corners erected by the govern-
ment to conform to the field notes, was found guilty of mal-
administration of his office and was removed. In *State v.
Oleson*, 15 Neb., 247, the relator was removed from the of-
fice of sheriff for official misdemeanors and the judgment
was affirmed. It is true the principal question in this
court was the jurisdiction of the county commissioners to
try the cause, but the character of the offense was also to
some extent involved. In *State v. Meeker*, 19 Neb., 444,
the respondent was removed from office by the county
board of Saline county for certain alleged violations of
the law, and while an appeal was pending this court com-
pelled him to deliver over the books of the office to the
person appointed in his stead. In these cases there was no
hesitancy on the part of this court to hold that these judg-
ments of removal were valid. Among the grounds men-
tioned in the statute for removal from office are habitual or
willful neglect of duty. (Comp. Stats., ch. 18, art. 2, sec.
1.) An examination of the constitutional provisions of a
number of the western states will show that misdemeanor
is cause for impeachment. Thus:

Section 1, article 7, of the Wisconsin constitution pro-
vides for impeaching "all civil officers of this state for cor-
rupt conduct in office, or for crimes and misdemeanors."

Section 7, article 6, of the constitution of Indiana de-
clares that "All state officers shall for crime, incapacity, or
negligence be liable to be removed from office either by im-

peachment,  *  *  *  or by a joint resolution of the general assembly."

Section 30 of the constitution of Illinois provides that "The general assembly may for cause entered on the journals, upon due notice and opportunity for defense, remove any judge upon concurrence of three-fourths of all the members of each house. All other officers in this article mentioned shall be removed from office on prosecution and final conviction for misdemeanor in office."

Section 197 of the constitution of North Dakota provides for impeachment for "misconduct, malfeasance, crime, or misdemeanor in office, or for habitual drunkenness, or gross incompetency." Section 4, article 16, of the constitution of South Dakota is the same.

Section 28, article 2, of the constitution of Kansas provides for impeachment for any misdemeanor in office.

Section 20, article 3, of the constitution of Iowa provides "for impeachment for any misdemeanor or malfeasance in office."

The constitution of Colorado specifies "high crimes or misdemeanors or malfeasance in office." (Sec. 474.)

Other states provide for substantially the same causes.

The provision in the constitution of this state is broader than that of any of the states named except Kansas. Under our constitution any gross misconduct in office is cause for impeachment. It would be a violation of the oath of office and of the officer's duty. In that respect our constitution is much broader than the common law term "high crimes and misdemeanors." But even at common law the offense need not necessarily be a crime punishable by the criminal law. Alexander Hamilton, in No. 65 of the Federalist, says: "The subjects of its jurisdiction are those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated political, as they relate

chiefly to injuries done immediately to the society itself." Hamilton's views are generally adopted in this country. In the early part of the present century impeachment was the ordinary mode of removing objectionable officers. Thus, in Massachusetts and some other states, county officers and even justices of the peace were impeached. In many, if not all, of the states at the present time the statutes provide for a simple, direct proceeding in an action in the courts in the nature of impeachment against certain officers who are guilty of misconduct in office; and impeachment is but one of the remedies for that purpose, and in this state, as applied to a state officer, is the sole remedy. The causes, however, which would cause the removal of a county officer on the ground of misconduct in office would seem to be sufficient against a state officer.

The claim that there was no willful disregard of law in the penitentiary cell house is clearly shown to be unfounded. The respondents' duty to the state was, in the first instance, to appoint a capable, efficient superintendent who would protect the rights of the state; second, see that the state received as fair treatment as other contractors in the employment of convicts, and purchase of materials, and to exercise a general supervision over the work; and third, to permit no money to be drawn except on original vouchers of the persons primarily entitled to the money or their assignees. In all these respects there was a failure to discharge their duty. Their claim that they knew nothing against Dorgan is entitled to no weight whatever. They did know that he represented the party who could and probably would profit by his being superintendent. Indeed the argument that they were able to hire him cheaper than a disinterested party is an admission of his unfitness, as it shows that he was drawing full pay for his services from Mosher at the same time. In addition to these facts, each allowance of an estimate without a voucher was a violation of a duty by the respondents by which they wrong-

State v. Hastings.

fully and willfully permitted Dorgan to draw money from the treasury.

Some attempt was made to prove usage as a defense to some or all of these charges. But the authorities are uniform that usage cannot be proved to contradict the expressed terms of a contract or where it would result in violating some positive requirement of statute. (Rogers, Expert Test., 271–272, and cases cited.) It is very clear that proof of usage cannot be considered, otherwise we might be asked to sanction the practice at asylum switch.

Considerable stress is laid upon the good faith of the respondents in committing these acts. This question was before this court in *Cobbey v. Burks*, 11 Neb., 161–162, in an action for taking illegal fees. It is said: "The penalty imposed by this act may be incurred by exacting fees which are supposed at the time to be legally demandable. By the very words of the prohibitory clause the taking is the gist of the offense. Ignorance of the law will not excuse in any case; and this principle is applicable, and with irresistible force, to the case of an officer selected for his capacity and in whom ignorance is unpardonable. The very acceptance of the office carries with it an assertion of a sufficient share of intelligence to enable the party to follow a guide provided for him with an unusual attention, clearness, and precision. On any other principle a conviction would seldom take place even in cases of the most flagrant abuse; for pretexts would never be wanting." It may be said that the people having elected these men, their will should be respected and they should not be ousted for the offenses charged. In every vote I have given in this court I have favored carrying out, as far as possible, the will of the people as expressed through the ballot-box; but the same constitution which provides for the election of officers and for a discharge of the duties of the officers also provides for declaring the office vacant in case of serious, willful misconduct; in other words, where the officer fails to faith-

fully perform the trust committed to his hands. The doctrine has been applied in equity from time immemorial. Thus, if a trustee misbehaves in any way to the detriment of the estate he may be removed. (*Ex parte Reynolds*, 5 Ves., 707.) So if he refuse or neglect to execute the trust it is cause for removal. (*In re Mechanics Bank*, 2 Barb. [N. Y.], 446; *De Peyster v. Clendining*, 8 Paige [N. Y.], 295; Perry, Trusts, sec. 419, and cases cited.) This rule has been applied by this court against inferior officers in a number of instances. Thus, in *Brock v. Hopkins*, 5 Neb., 231, it was held that a clerk of the district court was liable for damages occasioned by his negligently and carelessly taking insufficient security. While if he exercised a reasonable degree of care in the performance of his duty he was not liable. In *Fox v. Meacham*, 6 Neb., 531, it was held that where a justice of the peace violates the law and abuses his authority to the injury and damage of another he and his sureties are liable on his bond for such damages. I know of no reason why the same rule which would hold a county officer liable for damages, or guilty of an offense for which he might be removed should not be applied to the state officers. The charge in both cases is substantially the same, viz., misconduct in office. If a county officer is guilty no one will urge as a reason for condoning the offense that the accused was elected to the office and that the people would be deprived of his services by his removal; and I know of no good reason why the same rule should not be applied where the officer is elected by the entire state.

It is said the respondents acted judicially in approving accounts and therefore are not liable for their acts. The able attorneys for the respondents made no claim of this kind, and, therefore, it is evident that they did not rely upon it. If in approving accounts they act judicially, in order to protect them there are three things which must concur: First, the claim must be one they are authorized to audit; second, it must be presented in the form of a bill

or voucher showing the debt and what it is for, otherwise the board would be like a judge passing upon a matter not before him—such as a matter not put in issue; and third, the statute makes it their duty to investigate every claim. The protection accorded to a judge against a private action does not apply when he is on trial under specific charges of impeachment. Even a judge of this court could not plead protection against such charges. In such case his conduct and general manner of conducting his business may be inquired into, and if he is found guilty of misconduct on any of the charges he may be declared guilty. But no judicial officer is protected when he exceeds his authority, and these respondents very clearly, in all they are charged with, acted either without authority of law or in excess of such authority. But in my view their duties are not judicial. In the proper sense they do not allow accounts. They merely investigate, or should investigate, the vouchers and the several items thereof to see that they conform to the contract. In other words, the duty of the board is to let contracts in a specified manner, and when vouchers are presented under such contracts which, upon examination, are found to be correct, they are to certify the same to the auditor. The certificate is not a final order from which an appeal would lie, and is not a judicial act. It will not be seriously contended that an officer who negligently and improperly certifies a fraudulent account which it was his duty to investigate, or who unlawfully draws money from the treasury, is protected from the consequences of his acts, and, so far as I am aware, no case so holds.

The rule announced in this case, it seems to me, would have protected Tweed from prosecution. Yet we know that he was tried and convicted for obtaining money from the city of New York upon fictitious claims allowed against the city by the proper authorities, and suit was also brought in behalf of the people to recover the money so obtained. In *People v. Tweed*, 63 N. Y., 194, the petition alleged

State v. Hastings.

that Tweed was president of the board of supervisors of the county of New York and * * * "procured various fictitious claims to be made up, purporting to be liabilities, amounting in the aggregate to $6,198,957.85, specified in a schedule annexed, which were presented and by the procurement of said conspirators were certified to by the three auditors named," etc., and it was held that the action could be maintained.

Proof was introduced on behalf of the respondents to show that Dorgan, Knapp, and others had given bonds to the state. It is evident that none of these bonds will cover the actual loss to the state, and even if enforced would be an inadequate remedy. But the giving of a bond by an officer does not exempt him from the performance of his duty, nor relieve those who superintend his acts from a faithful supervision of the same. The law imposes the duty of supervision with "a reasonable degree of care." The duty of an officer is stated by Judge LAKE in *Brock v. Hopkins, supra,* that he exercise a reasonable degree of care in the performance of his duty. It seems to me the respondents wholly failed in the performance of their duties in the cases specified in these charges, whereby the state during the ten months that Dorgan was superintendent lost a large sum of money, probably not less than $15,000; and $234 for resetting the boilers which was not a debt of the state, together with the sums drawn by Hopkins and Howe to go to Pittsburgh, and the respondents to go to St. Louis, in all $934. The overpayments for coal, all in sixteen months, exceed $12,000. An ordinarily prudent man would have required the vouchers to be in proper form, giving the numbers and weights of the several cars. There are telephones in all of the public buildings so that it would have taken but a moment to make the proper inquiries in regard to the coal and protect the interest of the state, but so far as the proof shows such inquiries were not made in a single instance. A public officer, like any other

servant, should be faithful to his employer to see that in all matters under his control the master shall not be defrauded; in other words, he shall be faithful to his trust, not as an eye servant, but in the sight of God. That is, in effect, the oath that each officer takes to faithfully perform his duty. Our public institutions should be conducted on business principles and without fear, favor, or favoritism, and no money should be drawn from the treasury except in strict pursuance of law. If the court should approve or even condone the conduct of the respondents in these cases, the influence of the decision will be felt in every department of business in the state as tending to weaken the sense of faithfulness of public officers and employés, and in every way prove detrimental to the best interests of society. There are an abundance of men in the state who can, and if the opportunity is given by their selection to the offices filled by the respondents will, faithfully look after the interests of the state; and as the respondents have failed in that regard, the charges are well taken and should be sustained. I therefore vote guilty as charged. I fear the result of the decision, if adhered to, will be to open a door to the grossest frauds in the public institutions of the state.

A number of the witnesses for the state testified as if under constraint, and there seemed to be powerful influences affecting some of them aside from the immediate friends of the respondents at work in their favor. The respondents, of course, are not responsible for these influences, but it is my duty to mention them.