STATE OF NEBRASKA v. GEORGE H. HASTINGS ET AL.

FILED JANUARY 3, 1894. NO. 6090.

MOTION for rehearing of case reported in 37 Neb., 96.
The motion was referred to the supreme court commis-
sioners, and, upon their recommendation, was overruled.
MAXWELL, C. J., dissented from the order overruling the
motion, and filed the opinion following:

MAXWELL, C. J.

In my view the motion for a rehearing should be sus-
tained. A careful examination of the majority opinion as
reported in 37 Neb., 96, 55 N. W. Rep., 778, shows that the
majority of the court really sustained the principal charges
against the defendants. Thus it is said: "At the time of
the appointment of Dorgan to superintend the construction
of the cell house he was the agent and manager of Mosher,
the lessee of the penitentiary, and charged with the duty of
subleasing the prison labor. In view of that fact his se-
lection by the board as the representative of the state,
knowing, as will hereafter appear, that it would be obliged
to depend upon Mosher for labor to carry on the work, is
highly censurable, and should, to say the least, be charac-
terized as unbusinesslike, and utterly wanting in that in-
telligent regard for the interests of the state which the
law demands of public officers under like circumstances."
Could there be a more serious charge against public officers
than that they "were utterly wanting in that intelligent re-
gard for the interests of the state which the law demands
of public officers under like circumstances"? We must
remember that the man appointed by the board, against
whom this language is used, is W. H. Dorgan, at the time
the overseer and manager of Mosher in the penitentiary.
This man, on mere estimates and in violation of the duty of

the board, was permitted by them to draw more than $32,000 out of the treasury by their approval of his estimates and accounts, while the whole amount of labor and material furnished by him did not exceed, if performed by citizen labor, more than $13,260, and probably did not cost more than $8,000. There was no money in the treasury, so that the warrants have presumably been drawing interest at seven per cent. It is true that Dorgan afterwards paid to Hopkins about $6,000, but he still retains in his hands in the neighborhood of $15,000, with two years' interest thereon. If there has been any attempt on the part of the board to recover this money we are not advised as to the fact. The truth appears to be that this money was either loaned or practically donated to Mr. Dorgan, and this occurred by the want of intelligent regard for the interests of the state, which the majority of the court find to be the fact in the appointment of Dorgan.

David Butler, the first governor of this state, was impeached and removed from office because he had appropriated about the same amount of money as Dorgan has in this case. Butler, however, offered to secure the state, and afterwards did secure it, and finally the debt was paid. Notwithstanding this fact, the proposed security, he was removed from office because his appropriation of the money was in fact embezzlement, which it was the duty of the house of representatives and senate to condemn; otherwise, the state would be liable to be plundered by its own officers. It was contended then, as now, that the offense did not justify impeachment; that that was a heroic remedy to be applied only in extreme cases; but after full argument, and a careful investigation of the law, the senate, which contained a number of capable lawyers, held the act proved was sufficient cause for impeachment and removal from office; and no intelligent lawyer at the present time will question the conclusion reached in that case.

In the case at bar the state, through these defendants,

has been deprived of this money; and it either directly or indirectly forms a part of the debt of the state to the school fund on which it is paying interest. So in regard to the other principal charges, they are admitted to be true, but the offenses are condoned. It is claimed that they do not justify impeachment. The object of impeachment in this state is to secure the removal of the delinquent officers. The findings in this case are practically a verdict of guilty. It is unnecessary to set them aside, but simply to vacate the conclusions of law. Will any one contend that the acts complained of are not misdemeanors? They were acts in disregard of their duty, by which the state was defrauded. Suppose the officers spoken of were county commissioners and let contracts and allowed ·claims against the county as these respondents have done. Would they not be subject to removal from office? No court would hesitate for a moment to direct such removal. Yet removal of a county officer from office for· these offenses is but another form of impeachment. It may be said that a state officer will not be impeached for as small an offense as a county officer. Why not? Both take substantially the same oath, and the law requires the same duties of both; viz., that they shall perform the same faithfully and to the best of their ability. It would seem if any discrimination is to be made it should be to require more strictness of the state officers than the officers of a county. This much is certain: if these men are justified for these acts, or they are held to constitute no ground of offense, it will be a direct invitation to other state officers to repeat these and similar acts, and will injuriously affect every department of business. The government of a state is a great business institution, and should be conducted on business principles, the.same as a well managed mercantile establishment. If it is not, if money can be stolen with impunity and appropriated by the parties, I fear that it will be difficult to persuade the employe of any other establishment that what is not pun-

ishable in a state official is punishable if committed in a private establishment. There can be but one standard for the carrying on of business, whether it is carried on in the state house or private establishment, and that is equal and exact justice to all.